IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DYLAN JAMES YOUNGBLOOD,<br><br>Defendant. | CR 24-22-M-DWM<br><br><br>OPINION<br>and ORDER |

Defendant Dylan James Youngblood seeks to dismiss the 18 U.S.C. § 922(g)(3) charge against him under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 29 (2022), and *United States v. Rahimi*, 602 U.S. ___, 2024 WL 3074728 (2024), arguing that § 922(g)(3) violates his Second Amendment right to possess firearms. (Docs. 15, 16, 23.) The government opposes the motion. (Doc. 19.) A hearing was held on July 9, 2024. (Doc. 29.) Based on the briefing and the arguments made by counsel at the hearing, Youngblood's motion is denied.

BACKGROUND

I.  **Statutory Background**

On April 24, 2024, Youngblood was charged by indictment with being a person who is an unlawful user of or addicted to controlled substances in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). (Doc. 1.) Section

1

922(g)(3) was originally enacted as a part of the Gun Control Act of 1968, Pub. L. No 90-618, Tit. U, § 102, 82 Stat. 1214, which was a "comprehensive gun control legislation intended to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *United States v. Ocegueda*, 564 F.2d 1363, 1365 (9th Cir. 1977). "In creating the classification 'unlawful user' as one category of persons not entitled to possess firearms, Congress intended to refer to any law federal, state, or municipal making the use of narcotics unlawful." *Id.* "The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). "Its broadly stated principal purpose was 'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Id.* at 220 (quoting S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968)). The House Manager, Congressman Emanuel Celler, similarly explained that the Act sought "to maximize the possibility of keeping firearms out of the hands of" certain individuals, including "drug addicts." *Huddleston v. United States*, 415 U.S. 814, 828 (1974) (quoting 114 Cong. Rec. 21784 (1968)). However, he conceded that neither the Gun Control Act, nor " any system of control can guarantee that society will be safe from firearms misuse," but that supporters of the Act were "convinced

2

that a strengthened system can significantly contribute to reducting [sic] the danger of crime in the United States." *Id.*

## II.     Factual Background

The parties recount a detailed history of Youngblood's use of controlled substances—heroin, fentanyl, and methamphetamine—leading up to September 13, 2023, the day on which the government alleges Youngblood illegally possessed a firearm. (*See* Docs. 1, 16, 19.) On April 30, 2023, law enforcement found Youngblood slumped in a parked car. After searching Youngblood, the deputies found a needle on his person, which he admitted contained methamphetamine. On May 2, law enforcement found Youngblood's romantic partner in a parked car with methamphetamine and needles. A few days later, Youngblood told his probation officer that the drug paraphernalia in the car was his, but the drugs were not. On May 29, 2023, law enforcement located needles and fentanyl pills on Youngblood's person. During that interaction, Youngblood told law enforcement that he used three to five fentanyl pills per day. On June 28, 2023, law enforcement found Youngblood in a vehicle with stolen license plates. They also found a syringe containing methamphetamine in his pocket.

On September 13, 2023, law enforcement executed an arrest warrant on Youngblood and located 31 fentanyl pills and two pipes commonly used to smoke drugs on his person. He admitted to possessing the pills and using them earlier that

day. After making the arrest, law enforcement did a visual search of his car and saw a firearm, which turned out to be a loaded Glock 19 Gen 4 S/NBCXD126 with a round in the chamber. They then searched the interior of the car and found another firearm, a loaded Ruger LC380 pistol S/N 325-73870, with no chambered round. (*See* Doc. 19 at 2–4.)

## LEGAL STANDARD

A pretrial challenge to the constitutionality of a federal criminal statute is generally considered under Rule 12(b)(2) of the Federal Rules of Criminal Procedure. *See United States v. Montilla*, 870 F.2d 549, 552 (9th Cir. 1989). In reviewing such a motion, a court must "assume the truth of what the indictment alleges." *United States v. Afshari*, 426 F.3d 1150, 1153 (9th Cir. 2005); *see United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). Here, Youngblood does not dispute that the Indictment states an offense under § 922(g)(3), but instead challenges the statute as unconstitutional on its face and as-applied to the facts of this case. To prevail on a facial challenge, he must demonstrate that "no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This is a "heavy burden." *Id.* Courts facing simultaneous as-applied and facial challenges ordinarily first resolve the as-applied challenge before addressing the facial challenge. *Bd. of Trustees of St. Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989).

ANALYSIS

Section 922(g)(3) states in pertinent part: "[i]t shall be unlawful for any person . . . who is an unlawful user of or addicted to any controlled substance . . . to . . . possess in or affecting commerce, any firearm or ammunition." Youngblood argues that the statute is unconstitutional because it violates his Second Amendment right to bear arms under the Supreme Court's watershed decision in *Bruen*. The government counters that pre-*Bruen* Ninth Circuit precedent upholding § 922(g)(3) forecloses Youngblood's challenge and, that because there is historical tradition of regulations that are relevantly similar to § 922(g)(3), the statute remains constitutional under *Bruen*. While the pre-*Bruen* Ninth Circuit precedent is unreliable, the government is correct that § 922(g)(3) remains constitutional, both facially and as-applied to Youngblood.[1]

---

[1] Overturning any § 922(g) subsection would have significant practical consequences. As the Supreme Court has noted, it "probably does more to combat gun violence than any other federal law." *Rehaif v. United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). Since the creation of the federal background-check system in 1998, it has resulted in more than 217,000 denials of firearms transactions, *see* Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS Section Denies*, November 30, 1998 – September 30, 2023, including more than 15,000 in 2021, the last year for which the statistics are available, *see* Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 19 (Apr. 2022). However, these modern practical consequences may not be considered when determining whether § 922(g)(3) complies with the Second Amendment's protections.

5

I.  **Ninth Circuit Precedent**

In 2011, the Ninth Circuit held § 922(g)(3) was constitutional under then-current Second Amendment jurisprudence. *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011) (relying on *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008)). That court reasoned that "the same amount of danger" exists "in allowing habitual drug users" to have firearms as "in allowing felons and mentally ill people to do so," because these people "likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances." *Id.* at 999. However, on May 9, 2024, the Ninth Circuit decided *United States v. Duarte*,[2] a case that casts doubt on whether *Dugan* remains binding precedent. 101

---

[2] No mandate has issued in *Duarte*, and the government has since sought *en banc* review. Thus, it is unclear if *Duarte* itself is binding authority. The Ninth Circuit's guidance on this issue is somewhat contradictory. For example, it has held that "no expectation of finality can attach during the period in which either party may petition for rehearing." *Carver v. Lehman*, 558 F.3d 869, 879 n.16 (9th Cir. 2009) (internal quotation marks and citations omitted). And that, "until the mandate issues, an opinion is not fixed as settled Ninth Circuit law. *Id.* (internal quotation marks omitted). And, relying on "the interim validity" of a pre-mandate decision is a "gamble." *United States v. Ruiz*, 935 F.3d 1033 (9th Cir. 1991). However, ruling on the question of "whether a published decision that has not been modified or withdrawn is binding on lower courts within the circuit," the Ninth Circuit has been clear that "a published decision constitutes binding authority and must be followed unless and until it is overruled by a body competent to do so." *In re Zermeno-Gomez*, 868 F.3d 1048, 1053 (9th Cir. 2017). Put succinctly, it is "clear error for a district court to disregard a published opinion" from the Ninth Circuit. *Id.* Regardless, however, *Duarte* involved an as-applied challenge to a different subsection of § 922(g). Thus, even if must be followed, it is not dispositive of the outcome here. That is especially so given the Supreme Court's

6

F.4th 657 (9th Cir. 2024). In *Duarte*, the court held that § 922(g)(1) violates the Second Amendment as-applied to the defendant in that case. *Id.* at 691. In so holding, the court concluded that a prior case affirming the constitutionality of § 922(g)(1), the felon in possession statute, was no longer binding precedent because it did not apply "the mode of analysis that *Bruen* later established and now requires courts to perform." *Id.* (discussing *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)). In what has been described as a "sea change in Second Amendment law," *Bruen* rejected the previous balancing test applied to Second Amendment challenges. *Id.* at 665. Instead, under *Bruen*, courts must first determine "whether 'the Second Amendment's plain test covers' the person challenging the law, the 'arm' involved, and the person's 'proposed course of conduct.'" *Id.* (quoting *Bruen*, 597 U.S. at 17. If so, "the government must [then] demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 597 U.S. at 18) (alterations in original). Because *Dugan*, like *Vongxay*, was decided before *Bruen* and did not apply this test, its precedential value is in question and therefore is not relied upon here.

---

intervening decision in *Rahimi*, 2024 WL 3074728, which is discussed in more detail below.

7

## II. Second Amendment Constitutionality

Section 922(g)(3) is constitutional both facially and as-applied to Youngblood. Youngblood argues that § 922(g)(3) infringes upon his Second Amended right to bear arms because the statute is inconsistent with the history and tradition of firearm regulation in this country, specifically because laws present at this Nation's founding did not impose categorical bans on firearm possession "based on the chronic use of or addition [sic] to intoxicating substances, even at times when someone was not actively intoxicated." (Doc. 16 at 25.) Demonstrating the absurdity of the analysis required under *Bruen* and *Rahimi*, the government counters that the Nation's historical tradition demonstrates that Congress may disarm individuals, specifically intoxicated individuals, who present a special danger of firearm misuse. The government's argument is closer to the truth. Under *Bruen* and *Rahimi*, Section 922(g)(3) is constitutional.

### A. The *Bruen/Rahimi* Framework

The Second Amendment of the United States Constitution guarantees as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As indicated above, "*Bruen* effected a sea change in Second Amendment law," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023), and severely broadened the scope of the Second Amendment's

8

protections. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. For example, "prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 2024 WL 3074728, at *10 (quoting *Heller*, 554 U.S. at 626). Similarly, the government may "disarm individuals who present a credible threat to the physical safety of others." *Id.*

The ever-evolving "history-and-tradition" test outlined in *Bruen* and modified in *Rahimi* requires a two-step analysis to determine whether a law complies with the Second Amendment. *See id.* at *31 (Jackson, J., concurring). First, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Second, to regulate protected conduct, the government must show that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* This historical analysis requires courts to pay close attention to "[w]hy and how the regulation burdens the right." *Rahimi*, 2024 WL 3074728, at *6. In doing this analysis, "[a] court must ascertain whether the new law is '*relevantly similar*' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29) (emphasis added).

9

In *Rahimi*, the Court held that § 922(g)(8)(c)(i)—a law allowing the government to disarm individuals under qualifying restraining orders—was relevantly similar to the Nation's historical tradition of "barring people from misusing weapons to harm or menace others." *Rahimi*, 2024 WL 3074728, at *7. This historical tradition includes laws dating as far back as "the earliest days of the common law." *Id.* The Court cites, for example, a 1662 English law that "authorized the King's agents to 'seize all Armes in the custody or possession of any person'" so long as that person was "dangerous to the Peace of the Kingdome," *id.* (quoting 14 Car. 2 c. 3, § 13 (1662)), and a founding era law restricting "gun use by drunken New Year's Eve revelers," *id.* at *5.

Notably, the Court did not find any laws that specifically burdened the right to bear arms for an individual under a restraining order. *See id.* at *36 (Thomas, J., dissenting). Instead, the Court held that founding era surety laws and "going armed" laws are relevantly similar to § 922(g)(8)(c)(i). *Id.* at *7. "Surety laws were, in a nutshell, fines on certain behavior. If a person threatened someone in his community, he was given the choice to either keep the peace or forfeit a sum of money." *See id.* at *36 (Thomas, J., dissenting). "[T]he going armed laws prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" *Id.* at *9 (majority opinion) (quoting 4 William Blackstone, Commentaries on the Laws of England 149 (10th ed. 1787)). The

10

Court held that these legal "regimes" confirm the "common sense" notion that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.*

In so holding, *Rahimi* arguably relaxes *Bruen*'s rigid view of how similar a modern regulation must be to a founding era counterpart. *See id.* at *6 (holding that the Second Amendment, is "not . . . a law trapped in amber"); *see also id.* at *17 (Gorsuch, J., concurring) ("The Court reinforces the focus on text, history, and tradition, following exactly the path described in *Bruen*."). Now, as clarified in *Rahimi*, a modern firearm regulation must merely "comport with the principles underlying the Second Amendment" but "it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at *6 (majority opinion) (quoting *Bruen*, 597 U.S. at 30). Put simply, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* Indeed, "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

**B.    The Second Amendment's Plain Text**

Youngblood argues that his conduct is covered by the Second Amendment's plain text.  The Government does not substantively disagree.  Youngblood is correct, and his conduct satisfies *Bruen*'s first step.  Youngblood is an American

11

citizen who possessed arms in common use. *See Duarte*, 101 F.4th at 670–71, 676; *Bruen*, 597 U.S. at 19, 31–32. Thus, both the conduct regulated by § 922(g)(3) and Youngblood's conduct are within the Second Amendment's plain text.

### C.    Historical Tradition of Firearm Regulation

Since the Second Amendment presumptively guarantees all American citizens—even as a user of controlled substances—the right to possess firearms, the government "must justify [§ 922(g)(3)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The government argues that because the Nation has a historical tradition of temporarily disarming intoxicated individuals, it may do the same for users of controlled substances. Youngblood argues there are no founding era laws similar enough to § 922(g)(3). Because "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," *Rahimi*, 2024 WL 3074728, at *6, the government's presentation of a relevantly similar historical tradition suffices.³

---

³ While this Order relies on the parties' historical authority, consideration is also given to Justice Jackson's recent warning about the pitfalls of the *Bruen* methodology. Concurring in *Rahimi*, Justice Jackson cautioned: "It is not clear what qualifies policymakers or their lawyers (who do not ordinarily have the specialized education, knowledge, or training of professional historians) to engage in this kind of assessment. . . . *Bruen* also conscripts parties and judges into service

The government "justif[ies] its regulation" by presenting the Nation's historical tradition of temporarily disarming intoxicated individuals. *Id.* Each law cited below disarmed individuals during the period of their dangerous intoxication from alcohol use even though alcohol was legal at that time. Youngblood explains that alcohol consumption during the founding era "was pervasive in American society; it crossed regional, sexual, racial, and class lines. Americans drank at home and abroad, alone and together, at work and at play, in fun and in earnest. They drank from the crack of dawn to the crack of dawn." W.J. Roraaugh, *The Alcoholic Republic: An American Tradition* 20-21 (1979). Further, because the record does not include any legislative history surrounding the passage of the laws cited below, it is difficult to determine why these intoxicated people were disarmed. However, a "common sense" reading of these laws make clear that the founders wanted to limit people whose intoxication made it dangerous for them to possess firearms. *See United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) ("[H]abitual drug abusers . . . are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms.").

In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing," except at marriages and funerals. Acts of Mar. 10, 1655, Act 12, *reprinted in* 1 *The Statutes*

---

as amateur historians, casting about for similar historical circumstances." *Rahimi*, 2024 WL 3074728, at *32 n.2 (Jackson, J., concurring).

13

*at Large: Being a Collection of All the Laws of Virginia, From the First Session of the Legislature in the Year 1619*, 401-02 (William Waller Henning ed., 1823). In 1771, New York banned firing guns on New Year's Eve and the first two days of January to prevent "great Damages . . . frequently done on [those days] by persons . . . with Guns and other Fire Arms and being often intoxicated with Liquor." Ch. 1501, 5 Colonial Laws of New York 244-46 (1894); *see also Heller*, 554 U.S. at 632; *Rahimi*, 2024 WL 3074728, at *5. In 1746, New Jersey passed a law disarming drunk soldiers. *Acts of the General Assembly of the Province of New-Jersey* 303 (Samuel Nevill ed. 1752). In the early 19th Century, Rhode Island disarmed "idiots, lunatics, common drunkards, paupers, [and] vagabonds" by excluding them from militia service. *An Act to regulate the Militia*, § 1, *reprinted in Public Laws of the State of Rhode-Island and Providence Plantations*, 501, 503 (Providence, Knowles & Vose 1844); *see also Public Laws of the State of Rhode-Island, An Act to Regulate the Militia*, §1 & §45 (Jan. 1844 Session of the General Assembly), Duke Ctr. for Firearms L., https://perma.cc/B3C4-VWTF, (last visited July 11, 2024).

This historical tradition of temporarily disarming intoxicated individuals "impose[s] a comparable burden" on the right to bear arms as § 922(g)(3). *See Bruen*, 597 U.S. at 29. Section 922(g)(3) allows the government to temporarily disarm individuals if they are clearly users of controlled substances. The laws

14

identified by the government as being a part of the Nation's historical tradition of regulating firearms are relevantly similar to § 922(g)(3), and at times are even more burdensome. "[Section 922(g)(3)] is by no means identical to these founding era regimes, but it does not need to be." *Rahimi*, 2024 WL 3074728, at *9.

First, both § 922(g)(3) and the intoxication laws require the disarmed individual to be a user of a mind-altering substance. Like the intoxication laws, § 922(g)(3) disarms individuals who "took drugs with regularity, over an extended period of time." *United States v. Purdy*, 264 F.3d 809, 813 (9th Cir. 2001). The intoxication laws do not clarify the type of alcohol use that was required for an individual to be disarmed, instead relying on common sense terms like "common drunkards." Thus, it can be assumed that the Founders did not require the intoxication to be "extended" like the government is required to demonstrate today. *See id.* Additionally, the intoxication laws are more burdensome than § 922(g)(3), as they disarmed users of legal substances.

Second, both § 922(g)(3) and intoxication laws are temporary bans. In the Ninth Circuit, § 922(g)(3) may only be enforced if a person's drug use occurred "contemporaneously with his purchase or possession of a firearm." *Purdy*, 264 F.3d at 813. Consistently, and the government conceded at the July 9 hearing, if an individual no longer uses controlled substances, they may not be dispossessed of a

firearm, even if the government is aware of that individual's illegal drug use in the past.

Third, the intoxication laws do not seem to require any preemptive judicial determination of drunkenness prior to disarmament. This creates a more substantial burden on Second Amendment rights than § 922(g)(3). In the Ninth Circuit, § 922(g)(3) may only be enforced if an individual has been put "on notice that [they fall] within the statutory definition of 'unlawful [drug] user.'" *Purdy*, 264 F.3d at 812. To do so, the government must prove that a user's use of controlled substances was with "regularity, over an extended period of time." *Id.* at 813.

Ultimately, "[Section 922(g)(3)] is by no means identical to these founding era regimes, but it does not need to be." *Rahimi*, 2024 WL 3074728, at *9. The illegal drug use of today was not a societal problem the Founders had to consider. *See United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023), *cert. granted*, 2024 WL 3259662 (July 2, 2024) (No. 23-376) ("[The Founders] were not familiar with widespread use of marihuana as a narcotic, nor the modern drug trade."). Thus, it makes sense that the founding era laws disarming drunk people are different than modern laws disarming users of controlled substances like methamphetamine and fentanyl. In short, § 922(g)(3) is "relevantly similar to laws that our tradition is understood to permit." *Rahimi*, 2024 WL 3074728, at *6.

16

D.      **As-Applied to Youngblood**

Youngblood challenges § 922(g)(3) both on its face and as-applied. Following the Supreme Court's directive, Youngblood's as-applied challenge is considered first, *Fox*, 492 U.S. at 485, which if unsuccessful, forecloses his facial challenge, *see Salerno*, 481 U.S. at 745 (holding that to prevail on a facial challenge, a movant must demonstrate that "no set of circumstances exists under which the [statute] would be valid"). As discussed above, the Second Amendment's plain text covers Youngblood's right to bear arms. *See Duarte*, 101 F.4th at 670–76. Thus, the only question that remains is whether the Nation's historical tradition allows the government to disarm Youngblood. It does.

Youngblood was found by law enforcement to be in possession, and to have used, controlled substances, most commonly fentanyl and methamphetamine, on multiple occasions between April 2023 and September 2023. Although those drugs were nonexistent at the time of the founding, they are intoxicating in relevantly similar ways to alcohol. In fact, it would be hard to argue that methamphetamine and fentanyl are not more dangerous and intoxicating than alcohol. *See, e.g.*, *United States v. Bobo*, 2022 WL 16572010, at *6 (D. Ariz. Nov. 1, 2022) ("[E]ven a small amount of fentanyl can be deadly."). Youngblood admitted to using these controlled substances on multiple occasions, including earlier in the day on which law enforcement found the firearms in his possession.

17

Because the record demonstrates that Youngblood "took drugs with regularity, over an extended period of time, and contemporaneously with his . . . possession of a firearm," *Purdy*, 264 F.3d at 813, he may be constitutionally dispossessed of his firearms under §922(g)(3). And, because § 922(g)(3) is constitutional as-applied to Youngblood, it is also facially constitutional because he has not demonstrated that "no set of circumstances exists under which the [statute] would be valid." *See Salerno*, 481 U.S. at 745.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Youngblood's motion to dismiss the indictment (Doc. 15) is DENIED.

DATED this 17th day of July, 2024.

Donald W. Molloy, District Judge
United States District Court